COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

Middlesex Division                                    Docket No. 08D-3429-DVI

ELIZABETH SCHNAIRSOHN,
*Plaintiff*

v.

ERIC SCHNAIRSOHN,
*Defendant*

## JUDGMENT OF DIVORCE
(On Plaintiff's Complaint for Divorce, filed on October 6, 2008)

This matter came before the Court (DiGangi, J.) for trial on September 15 and 18, 2009. Plaintiff, Elizabeth Schnairsohn ("Wife" or "Mother"), was represented by Attorney Richard Novitch. Defendant, Eric Schnairsohn ("Husband" or "Father"), was self-represented.

All persons interested having been notified in accordance with the law, and after hearing, it is adjudged nisi that a divorce from the bond of matrimony be granted for the cause of irretrievable breakdown as provided by G. L. c. 208, § 1B, and that upon and after the expiration of ninety (90) days from the entry of this Judgment, it shall become and be absolute unless, upon the application of any person within such period, the Court shall otherwise order.

After hearing it is hereby **ORDERED and ADJUDGED**:

*Child Custody & Parenting Time*
1.    By agreement of the parties, which is dated September 15, 2009 and incorporated into this Judgment:
    a.    The parties shall have joint legal custody of their minor child, C█████ S█████ (d.o.b. █████).
    b.    Relative to medical care, either parent may authorize emergency medical treatment for the child when he is in their care and must immediately notify the other parent. Mother shall schedule all well visits without regard to Father's schedule. Upon the child turning five (5) years old, Father may attend the child's well visits.
    c.    Mother shall obtain prior written approval from Father for major decisions concerning the child's education, elective medical care and treatment, and any changes in religious development.
    d.    Mother shall have primary physical custody.
    e.    Father shall have parenting time every other weekend beginning Friday at 3:00 p.m. until Sunday at 2:00 p.m.

Page 1 of 6      |   **EXHIBIT D**

f.    Father shall pick up the child at the Tyngboro Police Station and Mother shall pick up the child at the Bellingham Police Station. If either party relocates, that party shall immediately notify the other party in writing so as to continue all exchanges at a police station in the new municipality.

g.    Father shall be responsible for transporting the child to all events and activities that occur during his parenting time.

h.    Subject to the communication provisions below, the parties may agree to different or alternating parenting time.

i.    Relative to communications and contacts between the parties:

    i.    Neither party shall contact the other party in person or by telephone, except in the case of a bona fide emergency relating to the child or to notify the other party of late or cancelled parenting time.

    ii.    When the child turns three (3) years old, Mother or her designee may initiate telephone contact with Father every other day between 6:00 p.m. and 7:00 p.m. as requested by the child. Father shall not initiate said contact.

    iii.    Otherwise the parties' contact shall be limited to one (1) written or electronic message every other day to advise the other party of new information related to the child. However, this provision shall not be construed as requiring Mother to provide Father with daily updates regarding the child.

    iv.    Each party shall stay away from the residence and work place of the other. If Father secures a work place outside of his residence, he shall notify Mother of such address in writing.

j.    The parties agree to the following holiday and vacation schedule:

    i.    Father shall have the child on Hanukkah for two (2) consecutive overnights not to run concurrently with Father's regularly scheduled parenting time. If Hanukkah conflicts with the Christmas holidays, the Christmas holidays shall supersede.

    ii.    Mother shall have the child on Christmas Eve/Day. If Christmas Eve falls on Father's regularly scheduled parenting time, Mother shall pick up the child at 10:00 a.m. on Christmas Eve and Father shall have make up parenting time as agreed by the parties.

    iii.    Father shall have the child on both Yom Kippur and Rosh Hashanna. If these holidays do not fall on Father's regularly scheduled parenting time, he shall have one (1) overnight with the child not to exceed his regularly scheduled time. Father shall pick up the child at 3:00 p.m. on the eve of the holiday and return him by 11:00 a.m. the next day.

    iv.    Father shall have the child for Thanksgiving on all odd years from 11:00 a.m. until 6:00 p.m. Mother shall have the child on all even years.

    v.    Mother shall have the child on Easter. If Easter falls on Father's regularly scheduled parenting time, Mother has the option of picking up the child at 4:00 p.m. on the Saturday before Easter or at 9:00 a.m. on Easter Sunday. In such case, Father shall have make up parenting time as agreed by the parties.

    vi.    Mother shall have the child on Mother's Day. If it falls on Father's

Page 2 of 6

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">
<strong>EXHIBIT</strong><br/>
<strong>D</strong>
</div>

regularly scheduled parenting time, Mother shall pick up the child at 10:00 a.m. on Mother's Day.

     vii.    Father shall have the child on Father's Day. If it falls on Mother's regularly scheduled parenting time, Father shall pick up the child at 11:00 a.m. on Father's Day and return him by 4:00 p.m.

     viii.    Commencing in 2012, Father shall have February school vacation with the child on all odd years. Said vacation shall begin Friday at 5:00 p.m. and end the following Friday at 5:00 p.m. Mother shall have February school vacation with the child on all even years. Also commencing in 2010, with regard to April school vacation, which shall have the same start and end times, Mother shall have the child on all odd years and Father shall have the child on all even years.

   k.    Relative to summer camp, the parties shall mutually agree upon the camp or activities selection on or before February 15 of each year. The parties shall share the cost of summer camp as detailed below.

   l.    Each party shall have one (1) week of summer vacation with the child beginning on Friday at 5:00 p.m until the following Friday at 5:00 p.m. In odd years, Mother may select her week first and must notify Father prior to March 15. Father shall do the same in even years. If either parent fails to select accordingly, that parent waives their right to do so and the other parent may select first.

   m.    Subject to the selection procedure set forth above:

     i.    In 2009, Father shall have two (2) non-consecutive blocks of three (3) overnights in the summer or winter. These overnights may not be used to extend Father's regularly scheduled parenting time.

     ii.    In 2010 and 2011, Father shall have two (2) non-consecutive blocks of four (4) overnights in the summer or winter. These overnights may not be used to extend Father's regularly scheduled parenting time.

     iii.    In 2012 and thereafter, Father shall have seven (7) consecutive days each summer. These days may not be used to extend Father's regularly scheduled parenting time.

   n.    Both Mother and Father shall be permitted to travel with the child outside of the Commonwealth for temporary trips and vacations. The parties shall provide each other advance notification of such overnight trips and vacations as well as an itinerary including an address and phone number and the child's return date. Except for the child traveling to Canada with Mother, neither parent may take the child outside of the continental United States without prior written agreement of the other party or order of the court.

### Child Support and Alimony

2.    Commencing Friday, October 9, 2009, Father shall pay $320.00 per week in child support until the emancipation of the child pursuant to G.L. c. 208, §28. Said order is made retroactive to the date of filing this Complaint. As such, in addition to the current order, Husband shall pay $107.00 per week, or $16,640.00 in total, in retroactive child support until paid in full.

3.    Neither party is awarded alimony.

### Child's Activities & Care

4. The parties shall share equally the cost and expenses of summer camp and extracurricular activities for the child that have been agreed-upon in advance. Each party shall submit to the other written documentation of said child-related expenses as said expenses are incurred. The other party will have thirty (30) days to remit his or her one-half of the expense to the party who incurred the expense.

5. The parties shall be equally responsible for the child's day care and pre-school program expenses. Each party shall submit to the other written documentation of said child-related expenses as said expenses are incurred. The other party will have thirty (30) days to remit his or her one-half of the expense to the party who incurred the expense.

### Division of Assets and Liabilities

*Personal Property*

6. Each party shall retain the vehicles in his or her possession and shall cooperate in effectuating the transfer of title of said vehicles. If not yet done, within thirty (30) days from the date of this Judgment, Husband shall remove Wife from all liability on the 2007 Lexus and Wife shall do the same for the 2004 BMW.

7. Husband shall solely retain his interest in the 2007 Suzuki GSXR motorcycle, valued at $4,200.00.

### Retirement and Bank Accounts

8. Each party shall retain the bank and/or credit union accounts held their individual names.

9. Wife shall solely retain her interest in the New York Life 401K account, valued at $12,212.00.

### Business Interests

10. Husband shall solely retain his interest in EAS Appraisals and shall indemnify and hold Wife harmless from any and all future liabilities associated therewith.

### Liabilities

11. The parties shall be jointly liable for any deficiency associated with the sale of the former marital residence located at 33 East Evergreen Road, Natick, Massachusetts. Wife shall immediately notify Husband if any deficiency results and the parties shall cooperate in the payment or resolution of said deficiency. If necessary, Husband shall be required to execute all documents necessary to effectuate the sale of said property.

12. The parties shall be jointly liable for any deficiency associated with the foreclosure of the parties' vacation home located at 8470 Village Edge Circle, Unit 2, Fort Myers, Florida.

13. Wife shall be solely responsible for the following liabilities listed on her financial statement:
    a.  Retail Services/Best Buy      $741.80,
    b.  Exxon Mobil                   $1,153.00,

|   |                        |                   |
|---|------------------------|-------------------|
| c. | Bank of America       | $9,824.00, and    |
| d. | Citi Cards (Citi II)  | $2,544.00.        |

14.  Husband shall be responsible for and assume Wife's Retail Services/Polaris credit card liability, Acct. No. ending in-3696, in the amount of $8,055.00. Wife shall forward a copy of the payment information to Husband who shall provide all payments to Wife within ten (10) days of the monthly due date until he has paid in full.

15.  Husband shall be responsible for and assume Wife's Citi Cards (Citi I) credit card liability in the amount of $6,119.00. Wife shall forward a copy of the payment information to Husband who shall provide all payments to Wife within ten (10) days of the monthly due date until he has paid in full.

16.  Husband shall be responsible for and assume Wife's Sprint cellular liability, Acct. No. ending in -0950, in the amount of $1,459.00. Wife shall forward a copy of the payment information to Husband who shall provide all payments to Wife within ten (10) days of the monthly due date until he has paid in full.

17.  Except as provided above, each party shall be solely responsible for all individually held liabilities.

*Miscellaneous*

18.  Wife shall maintain her existing health care insurance policy covering the parties' minor child and Husband pursuant to G.L. c. 175, § 110I. If Husband obtains new employment, he shall continue to provide health insurance for Wife and the minor children, until their emancipation, and for so long as Wife is eligible and there is no additional cost for her coverage. If there is an additional cost, Wife shall pay Husband if she wishes coverage. If Wife has no medical insurance available through employment, the first (1st) party to have insurance available shall obtain coverage for the minor child.

19.  Wife shall be responsible for the first $250.00 each year in routine uninsured health and dental/vision expenses for the minor child. All uninsured health and dental/vision expenses above $250 in each calendar year shall be equally shared by the parties. Said expenses shall include all uninsured medical, dental, hospital, optical, orthodontic, and pharmaceutical expenses for the minor children. Each party shall present receipts for said expenses to the other and reimbursement shall occur within thirty (30) days.

20.  Each party shall be responsible for payment of his or her own uninsured medical, dental, hospital, optical, and pharmaceutical expenses.

21.  Both parties shall obtain and maintain life insurance in the amount of $500,000.00 dollars naming the other party as trustee for the benefit of the minor child. The parties shall provide proof of said insurance to each other, Husband to Wife's counsel, within sixty (60) days of this Judgment and thereafter on January 1 of each year.

22.  Wife shall be permitted to claim the dependency exemption for the minor child on her

state and federal income tax returns each and every year for as long as her gross income does not exceed $250,000.00 per year.

23.    Wife's Motion for Counsel Fees is **GRANTED**.  Within ninety (90) days from the date of this Judgment, Husband shall pay $16,000.00.

24.    Husband's Motion for Counsel Fees is **DENIED.**

25.    In light of Husband's willfully false testimony and presentation of evidence to this Court, it is appropriate that Husband be assessed sanctions in the amount of $5,000.00 payable to the Middlesex Probate and Family Court c/o Chuck Shepherd, Rm. 38.

Date:    _Oct 27 2009_

_____
**Hon. Peter C. DiGangi, First Justice**
**Middlesex Probate and Family Court**

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

Middlesex Division                                    Docket No. 08D-3429-DVI

ELIZABETH SCHNAIRSOHN,
*Plaintiff*

v.

ERIC SCHNAIRSOHN,
*Defendant*

## PROCEDURAL HISTORY, FINDINGS OF FACT, RATIONALE, and CONCLUSIONS OF LAW
(on Plaintiff's Complaint for Divorce, filed on October 6, 2008)

This matter came before the Court (DiGangi, J.) for trial on September 15 and 18, 2009. Plaintiff, Elizabeth Schnairsohn ("Wife" or "Mother"), was represented by Attorney Richard Novitch. Defendant, Eric Schnairsohn ("Husband" or "Father"), was self-represented. The Court heard the testimony from four (4) witnesses: the parties, Daniel Tratenberg, and Meghan O'Neill. Forty (40) exhibits were entered into evidence. The parties submitted an agreement relative to custody and parenting time. After hearing the evidence and assessing the credibility of witnesses, the Court enters the following Procedural History, Findings of Fact, Rationale, and Conclusions of Law:

## RELEVANT PROCEDURAL HISTORY

1.  On October 3, 2008, Husband filed a Complaint for Custody, Support, Visitation.[1]

2.  On October 6, 2008, Wife filed a Complaint for Divorce pursuant to G. L. c. 208, § 1B on the ground of irretrievable breakdown of the marriage.

3.  Also on October 6, 2008, the parties entered into a Stipulation, which was incorporated into a Temporary Order and provides in relevant part that:
    a.  Mother shall retain primary physical custody of the parties' minor child, subject to Father's rights of visitation.
    b.  Father shall have supervised visitation every Tuesday and Thursday for two (2) hours. In addition, Father shall have supervised visits on alternating Saturdays or Sundays for five (5) hours.

---

[1]Notwithstanding that this filing is unnecessary and frivolous, the issues presented shall be addressed concurrently with Wife's Complaint for Divorce.

1 of 15

c. The supervisor shall be Meghan O'Neill. If she is unable or unwilling to serve as supervisor, the parties shall select a mutually agreed upon person to serve. Father shall bear all costs of the supervisor.

d. Father shall attend and complete anger management and shall provide evidence of enrollment in and completion of same.

e. The parties shall divide personal property as agreed or ordered by the court.

f. Until further order or agreement of the parties, Father shall possess and pay all costs associated with the Lexus. Mother shall possess and pay all costs of the BMW. The parties shall exchange all information required.

g. Mother shall continue to maintain health insurance for the minor child and Father.

4. On October 30, 2008, Wife filed a Complaint for Contempt alleging that Husband failed to enroll in an anger management course as directed by the Temporary Order issued October 6, 2008.

5. Also on October 30, 2008, Wife filed motions requesting the court establish a supervised parenting plan, as well as a suitable amount of child support.

6. On the same date, Wife filed an Emergency Motion for Restraining Order pursuant to G.L. c. 208, §18. She requested that Husband be prohibited from communicating with her in any manner, except in the case of an emergency, and ordered to stay away from her, her residence and workplace.

7. On October 30, 2008, the Court (DiGangi, J.) issued a Protective Order prohibiting Husband from harming Wife, ordering him not to contact Wife and to stay at least 100 yards away from Wife, Wife's workplace, and the parties' child except for purposes of visitation. Said order expired February 6, 2009.

8. On November 6, 2008, Husband filed a motion seeking among other things to have supervised visitation terminated.

9. Also on November 6, 2008, Attorney Barbara Egan was appointed as Guardian *ad litem* and ordered to evaluate and report relative to the issues of visitation.

10. On the same date, the Court (DiGangi, J.) issued a Temporary Order incorporating the recommendations of the Probation Department relative to visitation, which provided that Father shall have supervised visitation on various dates.

11. On December 4, 2008, Husband filed a Motion to Revise the Temporary Order dated November 6, 2008.

12. Also on December 4, 2008, the Court issued a Scheduling Order that in relevant part incorporated a Stipulation of the parties. Pursuant to the Stipulation, the parties agreed to provisional unsupervised visitation and holiday parenting time. The parties also agreed

to jointly retain Attorney Barbara Egan to assist them in finalizing a parenting plan. Lastly, the parties agreed to transfer title of their cars to the party in possession of the car, that Wife may trade in the BMW, and that the automatic restraining order be modified to reflect the same.

13. On December 9, 2008, Wife's Complaint for Contempt filed on October 30, 2008 was dismissed by agreement of the parties.

14. On February 6, 2009, the Court (DiGangi, J.) issued a Temporary Order incorporating the parties' Stipulations of the same date. Said Stipulations provided in relevant part that:
   a. Mother shall allow the Protective Order issued October 30, 2008 to lapse.
   b. Neither party shall contact the other except in the case of an emergency relating to the child or to notify the other party of late or cancelled visitation. Otherwise, communications shall be limited to one (1) email per week.

15. On February 12, 2009, Husband filed a Complaint for Contempt alleging that Wife violated a Temporary Order issued October 6, 2008 by failing to pay the costs associated with the parties' BMW in December 2008 and January and February 2009. On April 29, 2009, said complaint was dismissed with prejudice due to Husband's failure to appear and prosecute.

16. On March 12, 2009, the parties entered into a Stipulation, which was incorporated into a Temporary Order of the same date, providing that Husband shall coordinate with his brother to arrange the repossession of the Honda CBR motorcycle to Wife.

17. On or about March 31, 2009, Attorney Barbara Egan submitted her recommendations pertaining to visitation and communication between the parties.

18. On April 7, 2009, Attorney Barbara Egan submitted her final recommendations regarding school vacation, summer and vacation time.

19. On April 21, 2009, the Court (Donnelly, J.) appointed Patricia Fernandez to serve as a discovery master in these proceedings, with costs to be shared by both parties.

20. On May 28, 2009, Wife filed an Emergency Motion to Compel Husband to execute a purchase and sale agreement for the sale of the former marital residence.

21. On August 7, 2009, Attorneys Jennifer Manning-Zoll and Helen Litsas, counsel for Husband, filed a Motion to Withdraw, which was allowed on August 20, 2009.

22. On August 12, 2009, Attorney Barry Wilensky, who entered a special appearance for Husband, filed a Motion to Withdraw, which was allowed on August 20, 2009.

23. On August 20, 2009, Wife filed a motion seeking to restrict Husband's contact with her

counsel to once per week. Said motion was allowed on the same date.

24. Also on August 20, 2009, the Court allowed Attorney Jennifer Manning-Zoll's Motion for Attorney's Lien against Husband in the amount of $26,300.00.

25. On or about September 8, 2009, Wife filed a Motion for Counsel Fees.

26. Also on or about September 8, 2009, Wife filed a Motion in *Limine* to preclude Husband from calling an expert witness at trial. On the basis of untimely notice to Wife, said motion was allowed on September 15, 2009.

27. As directed by the Court, Wife submitted proposed Findings of Fact, Rationale, Conclusions of Law, and Judgment on October 2, 2009.

28. Husband's proposed Judgment was received by the Court on October 8, 2009.

## FINDINGS OF FACT

**Background**

1. The parties were married on October 23, 2003 in Westford, Massachusetts. This is the first marriage for both parties.

2. This is considered a short-term marriage.

3. The parties last lived together at 8 Museum Way, Apt.# 505, Cambridge, Massachusetts in September, 2008 when wife and the child moved in with her parents.

4. One (1) child was born of the marriage: ███████████████   ███████████

5. Wife and the minor child currently reside at One Derby Lane, Tyngsboro, Massachusetts, with Wife's parents and her brother.

6. Husband currently resides at 14 Whitehall Way, Bellingham, Massachusetts with his sister and her family.

**Age and Health of Parties**

7. Wife is currently thirty-two (32) years old ███████████ and enjoys good health

8. Husband is currently thirty-eight (38) years old ███████████ and is also in good health.

**Station of the Parties**

9. The parties enjoyed a middle to upper middle class lifestyle.

**Occupation, Vocational Skills, Employability, Income**

10.    Wife received a Bachelor of Arts degree from the College of the Holy Cross and a Juris Doctorate from Suffolk University Law School.

11.    Wife is currently employed as an associate attorney with the law firm of Goulston & Storrs, LLP.  She has maintained this employment throughout the parties' marriage.

12.    Wife currently earns $205,000.00 per year, or $3,942.30 per week.

13.    Husband attended Plymouth State from 1990 to 1996 where he studied business, accounting and mathematics.

14.    Prior to the marriage, Husband worked with Harmon Law Offices as a bankruptcy paralegal manager for approximately seven (7) years.

15.    During the marriage, from 2003 until 2005, Husband was employed as a real estate appraiser for Levine & Associates, which is owned and operated by Wife's parents.

16.    In 2005, Husband began his own real estate appraisal business known as EAS Appraisals. Husband initially ran the business out of the parties' residence.  However, once the business became successful enough, Husband rented a nearby office space.  He also maintained at least four (4) employees and trainees at different points in time.  Husband is licensed in both Massachusetts and Rhode Island.  He conducts appraisals of single and multi-family homes, condominiums, mobile homes, and trailers.  He generally works five (5) days, or fifty (50) hours, per week.  His fee for appraisals ranges from $250.00 to $425.00 for single family homes to $425.00 to $600.00 for multi-family homes.  In 2008, Husband conducted 305 appraisals.

17.    Husband contends that he is currently unemployed due to changes in federal appraisal requirements and his placement on the Freddie Mac exclusionary list.[2]  Even if Husband's real estate appraisal opportunities have been limited by these regulatory changes, the Court is skeptical that these changes have completely prohibited Husband from conducting appraisals.  In contrast, it appears that Husband's business in 2009 was picking up, which is sensible in the current real estate market.  Specifically, Husband conducted 172 appraisals between January 1, 2009 and June 2, 2009, thereby surpassing the fifty percent (50%) mark of appraisals conducted in 2008 prior to the 2009 mid-year point.  Further, the Court considers the testimony of Husband's colleague, Daniel Tratenberg, that the real estate appraisal business is the "best its ever been."  If, as Husband contends, further licensing is required, the Court is not aware of any impediments that would prevent Husband from obtaining said licensing.  As such, the Court does not credit that Husband is genuinely unemployed or unable to work and finds

---

[2] The Court notes that Husband's claim of unemployment appears to have conveniently coincided with this court appearance.

instead that he is voluntarily unemployed.

18. According to Husband's financial statement filed September 2009, he reports earning a weekly income of $1,268.20, or $65,946.40 per year. However, considering Husband's admissions that his previously filed financial statements were based on the 2007 tax returns that he knew to be incorrect and that he failed to review pertinent bank or business records in preparing the statements, the Court declines to rely on Husband's financial statements and finds them to be incredible.

19. The parties originally filed timely tax returns during the marriage. However, during these proceedings, it became clear that Husband's Schedule C business receipts had been largely understated. In fact, he testified that the original returns did not include the cash he received at the door. Thus, Wife has filed amended returns for 2006 and 2007. According to the parties' 2006 amended tax return, which Husband refused to sign, Wife's gross income from employment was $141,376.00. For the same year, Husband's business income after expenses from EAS Appraisals was $107, 359.00.[3] (See Ex. 11). According to the parties' 2007 amended tax return, which Husband again did not sign, Wife's gross income from employment was $137,249.00. Husband's 2007 EAS Appraisals income after expenses was $89,543.00.[4] (See Ex. 12).

20. In order to determine Husband's current income, the Court considers that Husband deposited $92,851.00 into his EAS appraisals bank account from January 2009 through August 2009.[5] (Ex. 24). Using his alleged and unverified business expenses of $4,044.77 per month, this results in an average monthly income of $7,561.60, or $90,739.26 per year.

21. Considering Husband's extensive real estate appraisal experience and the upward trend of his business, the Court finds that Husband is voluntarily unemployed. Further, due to Husband's lack of honesty in reporting his income, the Court finds it appropriate to attribute income to Husband. After combining and averaging Husband's 2006, 2007, and current income, Husband is imputed an annual income of $95,880.42, or $1,843.85 per week for purposes of establishing child support.

**Estate of the Parties**
22. The parties' estate consists of the former marital residence and personal property.[6]

---

[3] Husband's income was understated by at least $56,298.00.

[4] Husband's income was understated by at least $69,038.00.

[5] Because the parties have not filed 2008 tax returns, the Court relies on Husband's most recent bank statements to determine his current income.

[6] Wife does not assert any claim to Husband's interest in EAS Appraisals.

23. The former marital residence is located at 33 East Evergreen Road, Natick, Massachusetts. In order to assist the parties, Wife's parents initially purchased the home for the parties in 2003 prior to the marriage. The purchase price of the property was $367,900.00. After the parties' marriage, Wife refinanced the property and repaid her parents approximately five percent (5%) of the purchase price, which they paid as a down payment. In January 2004, the deed was transferred to Wife individually. The parties moved to an apartment in Cambridge in 2007 and rented this property for a short time. Due to extensive water damage in the basement of the home, which occurred while the property was for sale, the fair market value of the property has been significantly reduced.[7] Wife has filed an application for short sale. The property is currently under agreement for $235,000.00 and is awaiting approval from the second mortgagee. The first mortgage on the property is $412,000.00 and the second mortgage is $62,000.00. Thus, there is a combined deficiency of $239,000.00. It is unclear at this time whether the lenders will seek the deficiencies.

24. Wife maintains a New York Life 401K account valued at $12,212.00, as well as minimal checking accounts.

25. Husband maintains two (2) bank accounts, including a business account for which he did not provide the balance.

26. Wife possesses a 2004 BMW 530i that was jointly purchased by the parties in 2007. It has a fair market value of $16,500.00. However, because the car has negative equity of $3,000.00, Wife was unable to trade in the vehicle. Instead, Wife, with financial assistance from her father, purchased an SUV, which she currently drives. Thus, Wife makes monthly payments on two (2) vehicles.

27. Husband possesses a 2007 Lexus GX470 that was leased in Wife's name individually in 2007. This vehicle has no equity.

28. Husband also owns a 2007 Suzuki GSXR motorcycle that was purchased for $8,200.00 in 2008, but which is currently valued at $4,200.00.

**Needs of the Parties**

29. Wife's weekly expenses amount to $2,331.32, including child care and rent paid to her parents. Wife also maintains health insurance for the benefit of both Husband and the child.

30. Husband's reported weekly living expenses are $426.00.

---

[7] Husband contends that the damage and resulting reduction in value are due to Wife's negligence. However, Wife made diligent efforts to prevent the damage by obtaining insurance and checking on the property. More importantly, where both parties resided in the home and were involved in the selling process, the Court finds that Husband should bear the loss along with Wife.

**Liabilities**

31. Wife's liabilities amount to $223,609.70 and include the following:[8]
   a. $28,436.80 in credit card debt including:
      i. $741.80 with Best Buy/Retail services for the purchase of a television which is in Husband's possession (Ex. 30),
      ii. $1,153.00 with Exxon Mobil for charges incurred by Husband,
      iii. $9,824.00 with Bank of America for pre-separation consumer debt,
      iv. $6,119.00 with Citi Cards (hereinafter "Citi I"), including the down payment on Husband's Lexus and EAS Appraisals cash advances,
      v. $2,544.00 with Citi Cards (hereinafter "Citi II") for furnishings for the parties' Florida property, and
      vi. $8,055.00 with Retail Services/Polaris for a motorcycle for Husband's brother, which has been repossessed.
   b. $70,000.00 for 2006 and 2007 estimated unpaid tax liabilites,
   c. $1,459.00 in Sprint cellular phone charges incurred for Husband's brother,
   d. $30,000.00 to Michael and Jo Ann Levine for personal loans for legal fees and unpaid rent and child care,
   e. $4,713.90 in legal fees, and
   f. $89,000.00 in school loans.

32. Husband's liabilities, including his legal fees and student loans, amount to $80,011.00.[9]

33. The Court credits that all of Wife's credit card liability was incurred during the parties' marriage and has not increased since the parties' separation. As such it is equitable that both parties be required to repay said liabilities on an equal basis. As such, Wife shall be solely responsible for repaying the Retail Services/Best Buy, Exxon Mobil, Bank of America, and Citi II liabilities. Husband shall be responsible for paying Wife's Citi I and Retail Services/Polaris liabilities. To better equalize the parties' responsibilities, Husband shall also repay Wife's Sprint cellular phone charges.

34. Considering that the parties jointly filed tax returns that required amending, the parties should be equally responsible for the 2006 and 2007 estimated unpaid tax liabilities.

35. Although title to the former marital residence located at 33 East Evergreen Road, Natick, Massachusetts is held in Wife's name only, the Court finds that Husband should be jointly responsible for any liabilities resulting from the short sale of the property. As support, the Court considers that the parties jointly resided in the home both before and during their marriage. Husband also received the benefit of operating his business out of

---

[8]The estimated mortgage deficiencies were not included as no collection proceedings have been commenced.

[9] The Court did not include Husband's version of the estimated unpaid taxes for 2003-2008 where amended returns were only filed for 2006 and 2007 and no return has yet been filed for 2008.

the home on a rent-free basis. Not only did Husband benefit from the use of and residence in the home, but he also benefitted from the mortgages taken against the property. His consumer debt was paid and he loaned some of the funds to his friend. (See Ex. 25). Lastly, where Husband treated the property as his own during the marriage via the payment of the second mortgage for over two (2) years, the Court finds that it is inappropriate for Husband to shirk this responsibility now that it is a potential liability.

36.     In 2006, the parties jointly purchased and owned a condominium located at 8470 Village Edge Circle, Unit 2, Fort Myers, Florida. It was primarily occupied by Husband's brother. After Husband stopped paying the second mortgage in the fall of 2007, Wife could not afford the payments on her own. The property was foreclosed on in July 2009. At the time of foreclosure, the property had outstanding first and second mortgages with a combined total of $280,000.00. The property was foreclosed for approximately $30,000.00 leaving approximately a $250,000.00 deficiency. It is unknown whether the mortgagees will seek to collect the deficiencies. Based upon the joint ownership of this property, if the mortgagees seek to collect the deficiencies, both Husband and Wife shall be jointly responsible.

**Contribution and Conduct of the Parties**

37.     Although Wife was the primary financial provider of the family, both parties have contributed financial resources to their family unit.

38.     Wife has been the primary care taker of the parties' minor child. After the birth of the child, Wife remained at home for approximately six (6) months. Once Wife returned to work, the parties employed a nanny on a full-time basis who assisted with the child's daily care. The parties also hired a housekeeper to help with house cleaning.

39.     Wife testified to several incidences of violent or physical conduct exhibited by Husband both before and after the birth of their child. For example, before the child's birth there were more mild incidences such as Husband throwing the television remote at Wife. However, after the birth of their child, Husband's conduct worsened. In the winter of 2007, Husband became upset and threw his computer, keyboard, and monitor off of his desk and proceeded to punch a hole in both doors of his home office. Wife also testified to another incident, which occurred a month prior to the parties' separation. Wife explained that she was playing with the child in his room when Husband came in and began to upset the child. After Wife pointed out this behavior to Husband, he threw a toy dump truck filled with blocks across the room. Husband then kicked a glass of wine that was sitting within inches from the child. Husband has also been abusive to the parties' dog throughout the marriage.

40.     In addition, Husband has a pattern of badgering Wife with emails–sometimes sending as many as thirty five (35) emails per day–on issues unrelated to the parties' child. Said emails frequently contain threats and slanderous statements against both Wife and her family.

41.   Lastly, Husband carried on extramarital affairs with at least two (2) women during the parties' marriage. One was an employee with whom he traveled frequently. The other was the nanny for the parties' child.

**Opportunity to Acquire Future Assets and Income**

42.   Considering Wife's current substantial earnings and her capacity for advancement, the Court finds that she will have ample opportunity to acquire income and assets in the future.

43.   Husband has extensive appraisal experience with which he can acquire income and assets. Further, Husband has been successfully self-employed. As such, the Court finds that Husband has significant opportunity to acquire income and assets in the future.

**Alimony**

44.   Considering Husband's testimony that he has been able to maintain the same standard of living enjoyed by the parties during the marriage, the Court finds that Husband is capable of supporting himself and does not need alimony. For example, Husband has traveled extensively since the parties' separation and continues to drive a luxury vehicle. Further, his is still able to afford activities such as weekly hockey and high-end shopping.

**Needs of the Child and Child Support**

45.   The parties' child does not have any special needs.

46.   Maternal grandmother currently cares for the child during the day. He also attends a pre-school program a few days a week. Once these proceedings are finalized, Wife intends to move out of her parents home and send the child to a full-time day care or pre-school program. Considering the amount the parties' paid to have a nanny and the price of the child's pre-school program, Wife anticipates that the cost will be approximately $365.38 per week. Once this cost is actualized, the parties shall be equally responsible for the child's day care and pre-school expenses.

47.   Although the child is still young, the parties agree that the child will attend summer camp in the future. The parties shall be equally responsible for all costs associated with summer camp.

48.   The parties' combined income, including Husband's imputed income, is above $250,000.00 and thus beyond the guidelines. (See Findings of Fact Nos. 11 and 20) In such cases, a court considers the award of support at $250,000.00 as the minimum presumptive level and may award additional amounts in its discretion. Based upon the parties' incomes and the child's primary residence with Mother, the minimum presumptive order under the child support guidelines is $320.00. Because Husband shall be equally responsible for the child's day care expenses, the Court declines to increase the presumptive order. As such, Father shall pay $320.00 per week in child support until the emancipation of the child pursuant to G.L. c 208, §28.

49.     Considering that Husband has not paid child support since the parties' separation and that Wife has individually borne all of the child's expenses since that time, it is appropriate that this order be made retroactive to the date of filing.

## RATIONALE

The parties were married for five (5) years. The primary issues presented in this case are the division of the parties' assets and liabilities and the appropriate levels of child and spousal support. The parties agree that they shall have shared legal custody of their minor child and Wife shall have physical custody. The parties also agree to a parenting plan and holiday and vacation schedule as set forth in the Judgment.

### Division of Assets and Liabilities

Regarding the parties' minimal assets, in light of the relative values of Wife's New York Life 401K account and Husband's Suzuki motorcycle, the Court deems it is equitable under G.L. c. 208, §34 for each party to solely retain said assets.

The primary components of the marital estate are the liabilities generated by the parties' properties, unpaid taxes, and credit card debt. Regarding the former marital residence, although title is held in Wife's name only, the Court finds that Husband received extensive benefits through both his residence in and business use of home such that he should bear any loss resulting from the short sale of the property along with Wife. If the sale of the property were to produce a profit, it is likely that Husband would be singing a different tune. There is no dispute that the Florida property was jointly owned by the parties. As such, both parties shall be jointly responsible for any deficiency resulting from the foreclosure of the property.

Relative to the 2006 and 2007 estimated unpaid tax liabilities, both parties shall be equally responsible for payment of said liabilities. Wife does not dispute her liability. However, Husband contends that he should bear no responsibility because Wife was primarily responsible for the parties' tax filings. Notwithstanding the fact that Wife compiled and submitted the numbers provided to her by Husband to the parties' joint accountant, the Court discredits Husband's contention. Husband, who had unrestricted access to the parties' joint accountant, is not an innocent party. Not only did he knowingly sign the tax planners and returns, but he has admitted to understating the earnings for EAS Appraisals, his business. Husband testified to taking cash for services at the door and not reporting it. Husband, as the sole proprietor of EAS Appraisals, was in the best position to determine and report the income amounts that would appear on the parties' tax returns. Lastly, Husband's argument is without weight considering his intimacy with accounting procedures, from both his experience and education. As such, Husband shall be equally responsible along with Wife for all estimated unpaid tax liabilities resulting from the parties incorrectly filed tax returns.

Finally, where all of Wife's credit card liabilities were incurred during the parties' marriage, it is equitable that both parties be required to repay said liabilities on an equal basis as

set forth in the Judgement.

### Alimony

When considering Husband's claim for alimony, "'the crucial issue'" is "'the [spouse's] need for support and maintenance in relationship to the respective financial circumstances of the parties.'" Sampson v. Sampson 62 Mass. App. Ct. 366, 369 (2004), quoting from Grubert v. Grubert, 20 Mass. App. Ct. 811, 819 (1985), and Partridge v. Partridge, 14 Mass. App. Ct. 918, 919 (1982). Among other factors, a court should also consider the lifestyle enjoyed by the parties during the marriage as well as the length of marriage. See Rosenberg v. Rosenberg, 33 Mass. App. Ct. 903, 904 (1992); G.L. c. 208, §34.

Considering Husband's capacity to amply support himself, the Court finds that he has not demonstrated the requisite need in order to establish alimony. As support, the Court considers that Husband has been able to maintain the same lifestyle enjoyed by the parties during the marriage. (See Findings of Fact No. 42). In addition, Husband has demonstrated the ability to earn a substantial income and can earn more or less depending on his motivation as a self-employed individual. (See Findings of Fact Nos. 17-20). Lastly, based upon the short term length of the parties' marriage, the Court declines to award alimony to Husband.

### Child Support

Relative to child support, a Court shall establish an appropriate child support order consistent with the parties' incomes and/or earning ability. Moreover, a court is permitted to impose an attribution of income upon a finding that either party is "capable of working and is unemployed." Child Support Guidelines, II.H. Here, the Court finds that Husband is voluntarily unemployed. As support, the Court refers to Husband's long time real estate appraisal experience and success in operating his own appraisal business. The Court also considers that Husband's unemployment claim conveniently coincides with this trial and that his aggregate income and business supports an attribution of income. See, e.g. Croak v. Bergeron, 67 Mass. App. Ct. 750, 752 (2006). Lastly, Husband's lack of honesty in reporting his income essentially leaves this Court with no recourse but to impute income from his tax returns and bank records. See Pemberton v. Pemberton, 9 Mass. App. Ct. 9, 15-16 (1980) (explaining that a court may consider a party's "financial coyness" and other relevant sources to determine a party's true income). After combining and averaging Husband's 2006, 2007, and current income, Husband is imputed annual income of $95,880.42, or $1,843.85 per week for purposes of establishing child support.

In establishing a child support order, the Court must also consider that the parties' combined income exceeds the maximum income level covered by the child support guidelines. In such cases, a court looks to the minimum presumptive order and may award additional amounts in its discretion. Child Support Guidelines, II.C. Considering the presumptive support order for families with income outside of the guidelines and the child's needs, Father shall pay $320.00 per week, or $1,386.66 per month in child support until the emancipation of the child pursuant to G.L. c. 208, § 28.

While "the decision whether to give retroactive effect [to modified support] orders rests in the sound discretion of the judge," the judge should consider whether such retroactivity "would be contrary to the child's best interests, unjust, or inappropriate." Boulter-Hedley v. Boulter, 429 Mass. 808, 809 & 812 (1999). Where Husband has not paid child support since the parties' separation and Wife, as the primary custodian, has individually satisfied all of the child's needs, including day care, it is appropriate that this order be made retroactive to the date of filing this complaint.

### Counsel Fees

The Probate Court may, in its discretion, award counsel fees and costs to either party. G.L. c. 208, § 38. Considering Husband's conduct throughout these proceedings, the Court is inclined to grant Wife's Motion for Counsel Fees. Specifically, the Court refers to Husband's dilatory and unreasonable conduct and frivolous filings throughout these proceedings. See Britt v. Rosenberg, 40 Mass. App. Ct. 552 (1996). The false and misleading nature of the Husband's financial statements further complicated discovery and prolonged the trial. More importantly, Husband exhibited a pattern of threatening behavior toward Wife and her family in an attempt to secure a fantastical settlement. He also practiced both coercion and duress against Wife in hopes of obtaining alimony. Throughout these proceedings he has threatened to report Wife to nearly every alphabet agency, including the FBI, CIA, IRA, DOR, and BBO. Lastly, Husband, who appears to be malicious and intent on inflicting pain on Wife and her family, has become fixated on this litigation, making baseless claims and unrealistic demands that have unnecessarily protracted this litigation. See, e.g. Salten v. Ackerman, 64 Mass. App. Ct. 868, 875 (2005). That said, the Court finds the amount of Wife's requested counsel fees to be unreasonable considering the complexity and duration of this matter. Accordingly, Husband shall pay a portion of Wife's counsel fees in the amount of $16,000.00.

As a final matter, although this is unusual, the Court cautions other forums before which Husband appears that he lacks credibility entirely. The Court refers to Husband's knowing filing of false financial statements using not only outdated figures, but figures drawn from a tax return which he knew to be incorrect. Despite taking an oath, Husband also knowingly presented false testimony to this Court regarding his business practices and involvement in extramarital affairs. In other words, this Court found both Husband's financial statements and testimony to be highly incredible. Not only was Husband entirely unreliable, but his failure to tell the truth while under oath constitutes perjury. See Miaskiewicz v. Commonwealth, 380 Mass. 153, 157-158 (1980) ("'The crime of perjury in a judicial proceeding occurs whenever one 'willfully swears or affirms falsely in a matter material to the issue or point in question. G.L. c. 268, § 1.'"). This conduct along with Husband's baseless and wasteful use of judicial resources, both of which interfered with the Court's fact finding responsibility, can be considered contempt of court. See, e.g. Miaskiewicz, 380 Mass. at 157-158 (affirming finding of contempt after "petitioner not only lied willfully under oath, but enlisted judicial resources in a baseless, false and wasteful cause."). In such cases, a court has considerable discretion in dealing with contemptuous conduct that occurs in its presence. Commonwealth v. Brunnell, 65 Mass. App. Ct. 423, 424 (2006). For example, where conduct is "'not so disruptive as to warrant a summary contempt punishment but nevertheless interfere[s] with the efficient administration of justice, an assessment of costs may

13 of 15

be an effective judicial option in maintaining procedural control of a court room.'" Id. (citing Commonwealth v. Rogers, 46 Mass. App. Ct. 109, 112 (1999) ). The Court finds clear and convincing evidence that Husband willfully gave false testimony and presented false evidence to this Court that he knew to be perjurious. Therefore, it is appropriate that Husband be assessed sanctions in the amount of $5,000.00 attributable to the general fund of the Commonwealth of Massachusetts.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter. The Court is satisfied from the evidence presented that there has been an irretrievable breakdown of the marriage to the extent that the legitimate objects of matrimony have been destroyed. There remains no reasonable likelihood the marriage can be preserved and reconciliation efforts will not be successful. An irretrievable breakdown of the marriage has existed from the date of the filing of this complaint to the date of hearing. See G. L. c. 208, § 1B.

2. On divorce, marital property is divided based on a judge's assessment of multiple factors - length of the marriage, conduct of the parties, age, health, occupation, amount and sources of income, vocational skills, employability, liabilities, needs of the children, needs of the spouses, and the opportunity of each for future acquisition of capital assets and income. See G. L. c. 208, § 34.

3. G. L. c. 208, § 34 confers broad discretion on a judge in making equitable property divisions. Its purpose is to recognize and equitably recompense the parties' respective contributions to the marital partnership. See Harris v. Harris, 26 Mass. App. Ct. 1004, 1004-1005 (1988).

4. There is no specific formula to be followed for division of marital assets; rather the Court should consider each of the factors listed in G. L. c. 208, §34, and thereafter fashion a judgment appropriate to those factors. Belsky v. Belsky, 9 Mass. App. Ct. 852, 853 (1980).

5. This Court must review the value of *all* contributions of the respective spouses toward the marital enterprise including a party's contribution as homemaker as well as a party's financial contributions. See Schuler v. Schuler, 382 Mass. 366, 373 (1981), Zeh v. Zeh, 35 Mass. App. Ct. 260, 266-267 (1993).

6. In determining whether to award alimony this Court must balance a spouse's need for support in relationship to the financial circumstances of the parties. Gordon v. Gordon, 26 Mass. App. Ct. 973, 974 (1988); Grubert v. Grubert, 20 Mass. App. Ct. 811, 819 (1985); Partridge v. Partridge, 14 Mass. App. Ct. 918, 919 (1982).

7. "The objective of alimony is the maintenance of the dependent spouse in a standard of living close to that which the spouse was accustomed during the marriage." Rosenberg v.

Rosenberg, 33 Mass. App. Ct. 903, 904 (1992). However, "'[a] person does not have an absolute right to live a lifestyle to which he or she has been accustomed in a marriage to the detriment of the provider spouse.'" Heins v. Ledis, 422 Mass. 477, 484 (1996).

8.   The Child Support Guidelines direct that a trial judge may apply an attribution of income to a party that is found to be capable of working but is unemployed or underemployed. In doing so, the "Court shall consider all relevant factors including . . . the education, training, health and past employment history of the party, and the age, number, needs, and care of the children covered" by the order. Child Support Guidelines II (H) (effective Jan. 1, 2009).

9.   The Court is entitled to draw adverse inferences from a party's attempt to evade providing detailed financial information. Crowe v. Fong, 45 Mass. App. Ct. 673, 679 (1998) (quotation omitted); see also Pemberton v. Pemberton, 9 Mass. App. Ct. 9, 15-16 (1980).

10.  While, "the decision whether to give retroactive effect [to modified support] orders rests in the sound discretion of the judge," the judge should consider whether such retroactivity "would be contrary to the child's best interests, unjust, or inappropriate." Boulter-Hedley v. Boulter, 429 Mass. 808, 809 & 812 (1999).

11.  The Court has the authority to award counsel fees as part of a judgment of divorce. G.L. c. 208, §38. "A judge has considerable discretion in determining the necessity and the amount of attorney's fees." Moriarty v. Stone, 41 Mass. App. Ct. 151, 159 (1996).

12.  An award of counsel fees is appropriate to mitigate expenses incurred as a result of one party's deliberate conduct and unreasonable demands. See Hennessey v. Sarkis, 54 Mass. App. Ct. 152, 157 (2002).

13.  "'[A] court exercises considerable discretion in dealing with contemptuous conduct occurring in its presence.'" Commonwealth v. Brunnell, 65 Mass. App. Ct. 423, 426 (2006).

Date:   Oct 27 2009

_____
Hon. Peter C. DiGangi, First Justice
Middlesex Probate and Family Court

15 of 15

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

Middlesex Division                                    Docket No. 08D-3429-CU1

ERIC SCHNAIRSOHN,
*Plaintiff*

v.

ELIZABETH SCHNAIRSOHN,
*Defendant*

## JUDGMENT OF DISMISSAL
(On Plaintiff's Complaint for Custody, Support, Visitation, filed on October 3, 2008)

After considering the Judgment of Divorce entered on Defendant's Complaint for Divorce, filed October 6, 2008, it is hereby **ORDERED and ADJUDGED** that Plaintiff's Complaint for Support, Custody, Visitation is **DISMISSED.**

Dated: _Oct 27 2009_

Hon. Peter C. DiGangi, First Justice
Middlesex Probate and Family Court